UNITED STATES v. HOYT et al.

(Circuit Court, E. D. Washington, E. D. September 20, 1907.)

No. 1,181.

1. UNITED STATES—INDIAN COMMISSIONS—EMPLOYMENT—CONTRACT FOR SERVICES—CONSTRUCTION.

Defendant was appointed by the Secretary of the Interior as the disbursing member of a board of three commissioners to negotiate Indian treaties at $8 per day and traveling expenses, exclusive of subsistence, to continue at the pleasure of the Secretary of the Interior for the time being. Defendant was directed to proceed from his home in Nebraska to the agency in Washington without unnecessary delay, his salary to begin on the day of his departure from home. The instructions given the board required a study of the special needs of the Indians in each case, and the formation of agreements which would best promote their welfare and

weekly reports. Defendant paid himself and the other commissioners at the rate of $8 a day for the time that they were under instructions, or were holding themselves in readiness to obey instructions on vouchers reciting actual employment during such period. These vouchers were uniformly accepted without question, except for periods during which the commissioners were absent from their post on leave. *Held* that, under the rule of contemporaneous construction, the phrase "actually employed" should not be construed as equivalent to "actively employed," and hence the salary was not limited to days on which the commissioners were actually engaged in the performance of active duty.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 1, p. 172.]

2. SAME—ACCOUNTING.

Where a contract for the employment of Indian commissioners provided for a salary of $8 per day and traveling expenses, exclusive of subsistence during the time the commissioners were actually engaged in the performance of their duties, the disbursing officer of the commission was bound to account to the government for charges paid on the account of one commissioner for subsistence and for salary paid to such commissioner during leave of absence from the field, but which was returned to such disbursing officer by the commissioner's heirs after his death.

A. G. Avery, for the United States.
Happy & Hindman and Fred Miller, for defendants.

DIETRICH, District Judge.   This action is brought by the United States to recover from Charles G. Hoyt as principal, and his codefendant as surety, $2,916.50 and interest, which it is claimed the defendant Hoyt has failed to account for and pay over, as was his duty to do.  Hoyt was appointed by the Secretary of the Interior as one of three commissioners to negotiate treaties with the Crow, Flathead, and other Indian tribes, under the provisions of an act of June 10, 1896 (29 Stat. 341, c. 398) and of June 6, 1900 (31 Stat. 302, c. 785).   He was made the disbursing agent of the commission, and was authorized to issue checks for the purpose of paying the compensation of his associates and of himself and other expenses.   Some of his disbursements are claimed to have been unauthorized, and upon that ground plaintiff seeks to recover; and the controlling question is whether or not the commissioners were entitled to compensation for every day they were away from home acting or holding themselves in readiness to act under instructions during the period elapsing between the time they entered upon the discharge of their duties and the date of the termination of their commissions, or whether they were entitled to compensation only for the days upon which they were actually engaged in the performance of active duty.   Hoyt from time to time paid himself and his associates at the rate of $8 per day for each day elapsing during the existence of their commissions, and the amount in dispute is the aggregate of such payments for days upon which it is claimed by the government no services were rendered.

Under the provisions of the acts referred to, the Secretary of the Interior was authorized to appoint these commissioners, and to fix their compensation.   Hoyt's commission is dated June 25, 1900, and by it Hoyt is authorized to act "at $8.00 per diem and actual and necessary traveling expenses, exclusive of subsistence, to take effect July 1, 1900, or as soon thereafter as he shall file the oath of office and enter on duty,

and empower him to execute and fulfill the duties of that office according to law; and to hold the said office with all the rights and emoluments thereunto lawfully appertaining, to him, the said Charles G. Hoyt, during the pleasure of the Secretary of the Interior for the time being. "Reinstatement." This commission, which is signed by the Secretary of the Interior, was transmitted to Hoyt by the Commissioner of Indian Affairs by letter dated July 14, 1900, in which the commissioner states that the compensation of the defendant is to be "a salary of $8 per day and actual and necessary traveling expenses, exclusive of subsistence, the same to take effect upon filing of the oath of office and entering upon duty." There was inclosed in this letter, together with the commission, what is referred to as a copy of a draft of instructions for the guidance of the members of commission, the instructions being dated July 6, 1900, and to which reference will later be made. In this letter of July 14th the commissioner directs Hoyt to proceed from his home (which was at Beatrice, Neb.) to the Yakima agency (in the state of Washington), and to "take the oath of office and proceed to your field of duty without unnecessary delay. Your salary will be regarded as having begun on the day when you depart from your home for the Yakima agency, provided the oath of office shall have been taken and mailed to this office." The "instructions" of July 6th, above referred to, were in the form of a letter addressed to the three commissioners jointly—James H. McNeely at Evansville, Ind., Charles G. Hoyt at Beatrice, Neb., and B. J. McIntire at Kalispell, Mont. It is signed by W. A. Jones, Commissioner of Indian Affairs, and bears indorsement of the approval of the Secretary of the Interior dated July 9, 1900. After reviewing in detail previous negotiations with certain Indian tribes, and commenting upon existing conditions, certain specific and also general instructions are given to the commissioners for their guidance. In the closing paragraph is contained the language upon which the plaintiff principally relies for a recovery in this case. It is:

"You will be allowed compensation at the rate of $8 per day while actually engaged in the performance of your duties; also actual necessary traveling expenses. Your salaries will begin on the date of taking the oath of office and entering upon discharge of your duties."

Abstractly, and considered apart from the circumstances disclosed by the record, the language should be construed in support of the claim of the government. But, on behalf of the defendant, it is contended that viewing it in the light of other portions of the general letter of instructions, and of the phraseology of the commission and the letter of July 14th, and of the subsequent action and acquiescence of the officers of the Department of the Interior, a literal construction should not be adopted, but it should be concluded that compensation at the rate of $8 a day was contemplated for the entire time the commissioners were away from home, and were subject to the instructions of the department, and held themselves in readiness to obey instructions, whether they were actively or only passively engaged. From the general letter of instructions of July 6th, it appears that the performance of their official duties required of the commissioners the exercise of intelligence and discretion, and that no little responsibility was assumed in carrying out their instructions. Among other things the letter says:

"The most important part of your duties will be to study the special needs of the Indians in each case, in order that such agreements may be formulated as will best tend to promote their welfare."

And there follows many suggestions to be considered. The injunction is given that:

"The greatest care should be taken that the same (any agreements made), are perfect in every detail, including spelling, punctuation, etc., and that they clearly express the objects and purposes intended to be attained."

Commissioners are instructed first to take up the work with the Yakimas, and then "upon completion of your work on the Yakima reservation, or in case no agreement can be concluded, you will advise the office promptly and request further instructions. You will thereupon be directed to proceed to the Flathead Reservation and take up the work there." They are required to send all correspondence to the Commissioner of Indian Affairs, and to submit promptly at the close of each week a report showing the state of the work, the progress made, what was accomplished during the week passed, etc. It appears that the commissioners qualified and entered upon the discharge of their duties pursuant to these instructions, and were paid from time to time; no question now being made of the propriety of the payments covering the earlier period of their service.

From testimony of the defendant Hoyt, and, indeed, from his commission itself, it appears that he had been a member of a former commission engaged in the same kind of work, and he was made the disbursing agent because of his experience while upon the other commission. It further appears that during the existence of the former commission, while he was at Washington, at the suggestion of some officer of the Treasury Department, and with the approbation of the Commissioner of Indian Affairs, he was orally instructed that in paying the compensation of members of the commission a voucher should be taken indorsed with the certification of the payee and approved by the chairman of the commission, the certification being to the effect "that during the period covered by the within voucher I have been actually employed under the direction of the Secretary of the Interior in the duties enjoined by the statutes pertaining to my office"; and the defendant testified that, when he was appointed disbursing agent of this commission, he adopted the practice thus imposed upon and followed by the preceding commission, and as a matter of fact he did not wait until the end of the quarter to make payments of salaries, but paid in installments, usually at the end of the month, and then at the end of the quarter took a voucher with certification and approval as above indicated. These vouchers were sent by him to the Commissioner of Indian Affairs, and were audited and approved by the Interior Department and passed to the Treasury Department. There is no pretension on the part of the defendant that the payments which were made either to himself or to his associates were confined to the days upon which they were actually, and, in fact, rendering active service. Apparently from the beginning they proceeded upon the theory that they were entitled to compensation during all the time they were under instructions or were holding themselves in readiness to obey instructions. So far as the defendant is concerned, he paid him-

self at the rate of $8 per day for the entire time from July, 1900, until June 30, 1902. The letter from the Secretary of the Interior to him advising him of the termination of his employment is as follows:

"No appropriation having been made for continuing the work of the commission to negotiate with the Crow, Flathead, and other Indians, since that made by the act of Congress approved March 31, 1901, 31 Stat. 104, which was for the fiscal year ending June 30, 1902, your services as one of said commissioners will be recorded as terminated on the 30th ultimo."

This is the first and only instruction he received relieving him from duty, and the language is significant. It further appears that he remained in the West during all of this period, making his headquarters at Spokane, in the state of Washington, and away from his home in Beatrice, Neb., and engaged in no other employment, but held himself subject to instructions from the department. For a large portion of the time he was not rendering any active service except to send in his weekly and other reports, and to answer a few letters; and it would be impossible from the record to determine with any degree of accuracy upon what days he rendered any services at all, or for what portion of the time he should be paid, if he is to receive compensation only for the days upon which he was actively engaged in the performance of duty. It appears that his vouchers were passed, his accounts were approved, and he was not advised that there was any question of the propriety of the payments which he made to himself on account of compensation until after he had been informed of the termination of his commission. With the exception of the certificate indorsed upon the vouchers, as above indicated, there is nothing in the record upon which a claim can be made that he misrepresented the facts to or concealed the facts from the department, and by his reports from time to time, certain of which were made weekly, the department was advised of his whereabouts and of existing conditions. It was well known that he was many miles away from his home. The record discloses no information or intimation from the department that he was relieved from duty, or that he was at liberty to return to his home or to give attention to his private affairs. Early in 1902 a question arose as to the propriety of certain disbursements which had been made by the defendant to his associate commissioner, McIntire, and the department apparently concluded that inasmuch as McIntire, at a time when he was directed to perform a certain duty, procured leave of absence on account of the illness of his wife, and after his wife had recovered returned to his home at Kalispell and rendered no further service, but remained at his home and was not reassigned, he was not entitled to compensation subsequent to the time he was granted leave of absence. Apparently the Secretary of the Interior was in doubt upon the point, for in his letter of August 6, 1902, it is said that upon a reconsideration the department withdraws its objections, and Hoyt should be allowed credit for the payments which he had made to McIntire. Assuming, however, that the objection was withdrawn only so far as Hoyt's responsibility was concerned, still it is clear from the letter of Secretary Hitchcock, dated February 10, 1902, that the conclusion that McIntire was not entitled to compensation was based solely upon the facts and conditions above stated, and it is reasonably to be inferred

that at this time—that is, when McIntire's compensation was being scrutinized—the conduct of the other commissioners and the nature of the services which they were rendering, and the fact that they were drawing pay for the full time, must have challenged the attention of the Secretary of the Interior. And yet, notwithstanding, it appears that Hoyt's vouchers disclosing the payments to himself and McNeely were approved by the Acting Secretary of the Interior, the vouchers for the quarter ending March 31, 1902, by letter of June 3, 1902, and the defendant Hoyt's voucher for the quarter ending June 30, 1902, by letter dated July 31, 1902, 30 days after the termination of the defendant's commission. And in the letter of approval by the Acting Secretary, dated June 3d, it is said:

"Although commissioner McNeely left Muskogee for Evansville, Indiana [his home], on March 8, his voucher is allowed in full for the whole quarter; it appearing that he was sick and died at his home April 6th last."

Under all of the circumstances, I cannot escape the conclusion that both the defendant and the department acted upon the theory that while the defendant was acting under instructions, and was away from home holding himself in readiness for active service, he was entitled to compensation, and that, in the contemplation of the parties, the phrase "actually employed" was not equivalent to "actively employed." It is a familiar rule that in construing contracts courts may look beyond the language employed, and may avail themselves of the light of the circumstances surrounding the parties at the time the contract was made. Merriam v. United States, 107 U. S. 437, 2 Sup. Ct. 536, 27 L. Ed. 531. Moreover, there is no safer construction of a contract than that placed upon it by the parties thereto before any controversy arises between them. Lyman v. Railroad Co. (C. C.) 101 Fed. 636; Fitzgerald v. Bank, 114 Fed. 474, 52 C. C. A. 276; Topliff v. Topliff, 122 U. S. 121, 7 Sup. Ct. 1057, 30 L. Ed. 1110. Applying these principles, it is hardly reasonable to suppose that either the Secretary of the Interior or the defendant contemplated that if the defendant should go hundreds of miles away from his home to perform a service entailing responsibility and the exercise of intelligence and good judgment, and should be under obligation to obey instructions, he would accept such employment, if while so absent, and while necessarily awaiting instructions, he would receive no compensation, and would have to pay his own subsistence. By the first letters above referred to, he was required to go to the Yakima reservation. Suppose that, when he arrived there, he received a telegram to remain inactive until he was further advised, and, complying with such instructions, he staid at the reservation for 30 days, and was then advised that it was regarded as impracticable to negotiate with the Yakimas, and his services would be dispensed with. Can it be possible that his commission and the letters accompanying it could be so construed as to deprive him of compensation while so remaining inactive under instructions? And yet under the conditions assumed he would not be "actually engaged" in the performance of his duties, as this phrase is now construed by the government. By the letter of July 14, 1900, the defendant was instructed to go to the Yakima agency without delay, and he was advised that his "salary will be regarded as

having begun the day when you depart from your home." It was his right, if not his duty, to enter and remain in the field until advised that his services were no longer needed. It would certainly have been intolerable for the defendant to act upon his own judgment in that regard, and to go back to Beatrice, Neb., whenever he concluded that there was nothing for him to do in the field. Such conduct on his part would have been reprehensible, and the pursuit of such course by him would doubtless have led to his removal. The right to assign to duty implied the obligation to relieve from duty. Defendant was entitled to notice of both. The department seems to have regarded defendant as being actually in the service and under instructions at all times; otherwise it would not have received and accepted reports from week to week from him.

Moreover, as late as November 7, 1902, some time after the question arose as to the propriety of the salaries paid, in a letter to the Secretary of the Interior from the Commissioner of Indian Affairs, the latter, after reviewing the history of this and the former commission, refers to the fact that, when the commissioners asked for and received "leave of absence, it was without pay and the office when it granted such leave invariably granted it without pay." If it was understood that the commissioners were entitled to pay only when they were actively engaged in the performance of duties assigned to them, what need was there for the express condition that, when they were off on a leave of absence, they should receive no pay? If they were entitled to pay only when actively engaged in the performance of duty, it follows, of course, and without express, specific instructions, that they could receive no compensation while absent. The implication is clear that, when they were not on leave of absence—in other words, when they were in the field awaiting instructions or executing instructions—they were entitled to pay. In this letter of November 7th the Commissioner of Indian Affairs was commenting upon the McIntire compensation, and, as above indicated, his compensation seems to have been disallowed principally upon the ground that he had secured a leave of absence and thereafter he had never been reassigned to duty, and that he had gone to his home and had remained there. The case is not like that where the duties and compensation of an officer are prescribed and fixed by law, and where, therefore, any action or any construction of the law by a superior officer is no protection to the inferior officer or employé. In such a case all parties are bound to know the law and to act accordingly, and one officer cannot invoke for his protection the mistakes or acquiescence of another. Here the Secretary of the Interior was invested with power to appoint commissioners and to fix their compensation. He had power to terminate the employment at any time, and he also had the right at any time to insist upon a modification of the compensation for future service. He also had the power to acquiesce in or ratify a compensation already paid; and he certainly had the authority to acquiesce in and ratify the construction put by the defendant upon the commission or the terms of his employment. In all essential particulars the relations between the defendant and the department were similar to those existing between ordinary employé and employer.

Under the circumstances the following language found in the

opinion of the court in Wertz v. United States, No. 22,829 (decided by the court of Claims May 1, 1905) 40 Ct. Cl. 397, is very much in point:

"When the compensation of an officer is by the day the government is entitled to the benefit of an ordinary employer, viz., that of being liable only for the days, when the officer is actually employed, but conversely the government, like an ordinary employer, is liable for days when its officers have required the employé to hold himself in readiness for employment, or when he is constructively employed by being placed in circumstances where he cannot find other employment and is awaiting work to be furnished him by the Government officers, or when they allow him to hold himself in readiness in the belief that his service is required, or to render service in the belief that it is necessary and proper for him to do so."

I do not wish to be understood as intimating that if the facts had been withheld from the department by the defendant, or if the defendant misrepresented the facts, any action on the part of the department taken by reason of its ignorance of the real facts would accrue to the benefit of the defendant; but I have scrutinized the record carefully for the purpose of detecting any fraud on the part of the defendant or any attempt to mislead the department, and my attention has been called to nothing which convinces me of bad faith on his part; and I cannot escape the conclusion that the nature and extent of the services which were being rendered by the defendant during the period in question must have been and were known to the department. The only feature of the record upon which it is possible to base the contention that the defendant misrepresented the facts is the certificate above referred to, indorsed upon the vouchers of defendant and his associates. But, construing the terms of his employment as he did, the defendant apparently in good faith also construed this certificate, not as meaning that he was "actively" engaged in the performance of his duties, but only that he was actually employed in the sense that he was in the field under instructions, and was holding himself in readiness for active service, and that he was rendering such active services as were required of him from time to time. It is true that such a certificate might have misled some other department of the government, but the defendant was an employé of the Interior Department, the officers of which presumably knew what he was doing, and whether he was rendering any active services; for he was supposed to act only under instructions from that department, and it is to be presumed that it was cognizant of its own instructions. It is incredible that the defendant, if he had regarded the certificate as false, would have made it and put it in the hands of the very persons who would know from the records of their offices that it was false. The defendant does not seem to have given very much thought to the purpose for which the certificate was intended or to the reasons why it was required. He seems to have had the impression that it was a requirement of the Treasury Department more than of the Interior Department. Assuming the correctness of the theory of the defendant as to his compensation, the certificate would not exclude days when he was in the field awaiting instructions, but it would exclude the time during which the defendant was upon a leave of absence, or when he was ill, or when he was otherwise not in readiness to render service; also periods, if

any, during which he was relieved from service by instructions from the department, and to that extent the certificate would subserve a useful purpose even under his view of the compensation to which he was entitled. However that may be, I have been unable to conclude that the department was misled by this certificate indorsed upon the defendant's vouchers, and I am therefore of opinion that so far as the claim now made involves compensation paid by the defendant to himself the government should not recover.

The total amount sued for involves a portion of the compensation paid by the defendant to his associate McIntire. Were this a suit to recover from McIntire the amount so paid to him, it is possible that under the circumstances indicated, although not fully disclosed by the record, the plaintiff should succeed. This I do not deem necessary to decide. Taking the view, as I do, that the defendant made payment to McIntire in good faith, having reasonable ground to believe that the latter was entitled to the compensation paid to him, I have concluded that it would be unjust to the defendant to require him to reimburse the government for moneys which he so paid out, and from which he received no benefit. He was not advised by the department that McIntire was not in actual service; and, assuming to be correct his understanding of the conditions upon which the commissioners were to be compensated, I am unable to find that he acted unfairly or unreasonably.

The balance of the government's claim consists of two charges in the accounts of Commissioner McNeely, one being $4.50, the aggregate of several small items paid out on account of subsistence, for which clearly he should not have been reimbursed, and the defendant is chargeable therewith; also an item of $192 on account of the last 24 days of the quarter ending March 31, 1902. It seems that McNeely left the field and went to his home in Evansville, Ind., on March 8, 1902, where he remained until he died in the following April. The defendant issued checks paying McNeely for the entire quarter, and this action on the part of the defendant was expressly approved by Acting Secretary Ryan by letter hereinbefore referred to, and from which extract is quoted above; he at the time apparently having full knowledge of the facts. However, I infer from the record that either McNeely, or, after his death, his heirs, returned to the defendant $192 and this the defendant received and has not accounted for or turned over to the government. It does not appear why. Clearly he is chargeable with this amount.

It follows that plaintiff should have judgment against the defendants and each of them for $196.50; and interest will be allowed upon this amount at the rate of 6 per cent. from April 1, 1902. All exhibits offered by the plaintiff and received conditionally, or with the understanding that a ruling would be made later as to their admissibility, are admitted in evidence, and defendants may have their exceptions.